In the
 Missouri Court of Appeals
 Western District
 JUDY CONWAY, ET AL., )
 )
 Appellants, ) WD84487
 )
 v. ) OPINION FILED: March 15, 2022
 )
 REBECCA CALDWELL, ET AL., )
 )
 Respondents. )

 Appeal from the Circuit Court of Jackson County, Missouri
 The Honorable Charles H. McKenzie, Judge

Before Division One: Mark D. Pfeiffer, Presiding Judge, Karen King Mitchell, Judge and
 Gary D. Witt, Judge

 Judy Conway, et al. ("Appellants"), appeal the judgment of the Circuit Court of

Jackson County, Missouri ("trial court"), granting judgment on the pleadings in favor of

Respondents Rebecca Caldwell and other Missouri Department of Social Services

employees (collectively "Respondents"), finding that Respondents were protected by the

official immunity doctrine. On appeal, Appellants claim that the trial court erred in

granting Respondents' motion for judgment on the pleadings because (1) the Respondents'

answer denied that they were Missouri employees, so they were not entitled to official
immunity; and (2) Appellants' petition sufficiently alleged that the Respondents were

performing a ministerial duty making official immunity inapplicable, and even if their

petition had been deficient, the trial court should have allowed them to file a second

amended petition to cure the defects. We affirm the judgment of the trial court.

 Factual and Procedural Background1

 This case involves the circumstances surrounding the tragic death of A.J., a little

boy who died as a result of severe abuse from his father ("Father") and his stepmother

("Stepmother"). A.J. was born in May of 2008 and lived with his mother and siblings in

Lawrence, Kansas, until he was approximately two-and-a-half years old. The first hotline

call concerning A.J.'s welfare occurred in August of 2011, when the Kansas Department

for Children and Families ("KDCF") received a report that A.J. was left alone at his

mother's house with no adult supervision. A.J. was removed from his mother's custody

and was placed in the physical custody of Father. KDCF's records noted at that time, "SRS

services not indicated."

 In December of 2011, a second hotline call to KDCF reported one of A.J.'s siblings,

who also lived with Father, had lost twenty-three pounds, Father had guns all over his

house, and Stepmother had been observed high on drugs. A third hotline call that same

month reported that A.J.'s sibling had fallen down carpeted stairs and suffered internal

bleeding and extensive bruising on his forehead at Father's house. During the investigation

of this call, multiple instances of abuse of A.J. and his siblings were disclosed. In response

 1
 Because this case was ruled on the pleadings, the facts will be taken from the allegations in Appellants'
First Amended Petition unless otherwise noted. L.F. 20.

 2
to this investigation, KDCF requested Father sign a document promising to keep the

children safe from physical abuse, not use physical discipline, and not allow Stepmother to

have any contact with the children during the investigation. A.J. remained in Father's

custody, but Stepmother's children were removed from the home and placed with a relative.

By January of 2012, Father was allowing Stepmother back into the house. A fourth hotline

call reporting abuse occurred on December 6, 2012. Although KDCF found that abuse had

occurred, A.J. was still not removed from Father's home.

 Sometime between December of 2012 and March of 2013, A.J. moved with Father,

Stepmother, and the siblings, to Missouri. On March 4, 2013, a fifth hotline call reported

to the Missouri Department of Social Services ("MoDSS") that A.J. was made to stand in

the corner for over an hour as punishment, that A.J. had locks on the outside of his bedroom

door, that A.J. started fires, that dead animals were found in the garage, and that the house

was filthy with mice and chicken bones. On March 4, 2013, Respondent Caldwell was

assigned to investigate this hotline call by her supervisor, Respondent Jamie Pinney.

Caldwell investigated, and Father acknowledged that the house was dirty but explained

that they were still moving in. Caldwell learned that Stepmother had a history with Kansas

social services involving the children, that her children had been removed from her care,

and that A.J. started fires. Caldwell performed a follow-up investigation on April 5, 2013,

at which time A.J. had bruises on his face that Caldwell assumed were "dirt." Caldwell

ended her investigation on April 7, 2013, noting Stepmother's history with KDCF, but she

did not open a case or offer services other than to provide Stepmother with a phone number

for counseling. None of the children in the home was attending school, and Caldwell

 3
checked "home-schooling" in the "results" portion of her abuse and neglect report. Pinney

signed Caldwell's form.

 On July 8, 2013, MoDSS received a sixth hotline call, reporting emergency abuse

and neglect occurring at Father's house including that Stepmother beat "the living daylights

out of the kids for no reason," that Stepmother sold "meth" out of the home, that the

children were left unattended outside, and that the children were locked in a room. Again,

Caldwell, supervised by Pinney, was called to investigate. Instead, Respondent Heather

Miller went to Father's home on July 17, 2013, and interviewed A.J., who disclosed that:

Father and Stepmother yelled at him; Father kicked him in the head on the top and back

and that a "bone" came out; it hurt when Father kicked him; Father punched him in the

stomach; Stepmother pulled his ears and it hurt; Stepmother threw him on the floor and

was mean; and Father and Stepmother locked him in his bedroom by himself. The

Children's Advocacy Center in St. Joseph, Missouri, also conducted a forensic interview

of A.J. as part of the investigation. MoDSS concluded that A.J. was a victim of neglect,

and Father and Stepmother did not appeal that determination. On July 18, 2013, MoDSS

completed a safety assessment wherein A.J. was determined to be "unsafe" in the home of

Father and Stepmother, but MoDSS also determined that A.J. would not be removed from

the home; instead, MoDSS would attempt to provide intensive in-home services ("IIS")

and Family Centered Services ("FCS"). Kelly Fewins, supervised by Julie King, was

assigned to provide the IIS services to the family.

 On July 19, 2013, a meeting and screening for services was attended by the Juvenile

Officer, Father, Stepmother, Foster, Pinney, and King, in the family home. During the

 4
meeting, MoDSS determined that A.J. had serious mental health problems and needed

counseling, medication, psychological evaluation, and play therapy, but that Father had no

medical coverage to provide mental health services for A.J. MoDSS also determined that

Father and Stepmother needed child management education, and they were instructed not

to lock A.J. in his room. It was concluded that there was an imminent risk of physical

abuse. After two more visits from MoDSS caseworkers on July 22 and July 23, on August

1, 2013, Father and Stepmother instructed Fewins that they would no longer meet with

MoDSS because they were moving back to Kansas. They stated that they did not believe

A.J. needed a psychiatrist because they would not be giving him medication. On August

1, 2013, Fewins closed the Missouri DSS case and terminated MoDSS services because

the family would be residing in Kansas.

 On August 9, 2013, MoDSS caseworker Sarah Ragan made a seventh hotline call

to KDCF, reporting that an IIS and FCS case had been opened in Missouri, but Father and

Stepmother were not cooperating. Ragan reported that Father and Stepmother had moved

to Kansas and that there were continued concerns for A.J., including lack of mental health

services, potential physical abuse, and homeschooling, which meant A.J. was not seen by

people outside of his family. In response, KDCF contacted Father and Stepmother, who

reported that they still lived in Missouri.

 On August 21, 2013, an eighth hotline call was made to MoDSS reporting A.J. was

not being treated for his medical needs, he was locked in his room at night, and he was

"targeted" by Stepmother. KDCF was also notified by hotline call. MoDSS employee

Respondent Mari Wheeler, supervised by Respondent Michael Beetsma, was assigned to

 5
investigate this call. An unidentified MoDSS caseworker went to Father's home to

investigate, but Stepmother would not let the caseworker enter the home. Stepmother told

the caseworker that A.J. was not receiving medical care because there was no medical

coverage. Stepmother denied telling MoDSS that the family was moving to Kansas, and

she stated that they did not need services. Wheeler documented this information as risk

factors for abuse, but on October 7, 2013, Wheeler declined to open a case notwithstanding

having entered a final risk level as "high." Beetsma signed off as supervisor.

 On February 25, 2014, MoDSS received a ninth hotline call reporting again that A.J.

was being locked in his room, that Father was not providing for A.J.'s mental health needs,

and that A.J. remained vulnerable for abuse and neglect. MoDSS worker Amanda

Donnelly called Father to investigate the hotline call. Father stated that the family was

living in Kansas, that it would be best for A.J. to be in State custody, and that Father did

not want A.J. to return to his home. On March 3, 2014, Donnelly went to Father's Missouri

residence where she met with A.J., who had suspicious marks on his chin and forehead,

and who disclosed to Donnelly that he was forced to stand in the corner and do jumping

jacks and pushups all day. He also showed Donnelly a mark on his wrist from where he

said Father had taped his arms and legs as punishment.

 On March 4, 2014, MoDSS caseworker Respondent Megan Bruce screened Father

and Stepmother for a Voluntary Placement Agreement ("VPA"). Bruce used a form for

the screening and marked "no" in response to the question, "Is there a current allegation of

abuse and/or neglect?" and left blank the line asking whether there were any concerns

related to the safety of the child. A.J. was accepted into the VPA and was placed in the

 6
Respondent Spofford Residential Treatment Center ("Spofford") in Grandview, Jackson

County, Missouri. During A.J.'s stay at Spofford, Father and Stepmother refused to

participate in A.J.'s treatment or communicate with him. One of A.J.'s therapists

characterized this as "abandonment." In August of 2014, in preparation for A.J.'s release,

FCS employee Chave May notified Spofford that Father and Stepmother would have to

participate in transitional activities such as face-to-face interactions between A.J. and

Father, family therapy, overnight passes, and family visits. An aftercare plan was also

developed.

 On August 28, 2014, a tenth hotline call was made to MoDSS, reporting that Father

was unwilling to meet A.J.'s needs, that he would not return phone calls, and that he

expressly stated he would not follow up with A.J.'s outpatient care. Other agencies may

have been notified of this hotline call. MoDSS caseworker, Respondent Brittany Burleson,

was assigned to investigate this tenth hotline call, and she was supervised by Respondent

Madonna Forthofer. On September 4, 2014, A.J. was released to Father, and on September

23, Burleson learned that A.J. had been discharged to Father, and Father had moved A.J.

to Kansas. Burleson concluded that a case file would not be opened, and her action was

approved by Forthofer. More hotline calls were made in Kansas after A.J.'s discharge from

Spofford.

 In November of 2015, A.J.'s remains were found by law enforcement in Kansas

City, Kansas. Father and Stepmother were convicted of A.J.'s murder. Appellants brought

negligence claims against various people and entities, including the Respondent employees

of MoDSS. The First Amended Petition alleged that the Respondents owed A.J. a special

 7
duty to protect A.J. from foreseeable danger of harm from Father and Stepmother. In their

answer, Respondents denied paragraph sixteen of the Amended Petition, which alleged that

Respondents and others "were, at all relevant times, employees of MoDSS, acting in his or

her capacity as an employee of and in the course of his or her employment with MoDSS."

The denial read, "Defendants deny the allegations contained in this Paragraph; specifically,

Defendants deny that Fewins or King were employed by the Missouri DSS during the

relevant period of time." Respondents' answer also pled the affirmative defense of official

immunity: "Defendants, as employees of the State of Missouri, are entitled to official

immunity due to the fact that they did not breach any mandatory, non-discretionary duty

imposed by statute or regulation whose breach resulted in harm to the Plaintiffs."

 Respondents filed a motion for judgment on the pleadings, arguing that the

Amended Petition failed to state a claim on which relief could be granted because the

MoDSS defendants were protected by the public duty doctrine and by official immunity.

In response, Appellants argued that the public duty doctrine did not apply because the

MoDSS employees' "acts and omissions were ministerial, not discretionary, and their

failure to act created an unjustifiable and imminent risk that A.J. would be harmed by

torture inflicted by his father and stepmother." The last sentence of Appellants' brief in

opposition to judgment on the pleadings read, "Alternatively, Plaintiffs request leave to

amend their First Amended Petition, as deemed appropriate under the circumstances of this

case." The trial court agreed that official immunity applied to the Respondents and shielded

them from suit, granting their motion for judgment on the pleadings. The judgment did not

grant Appellants leave to amend their petition a second time, as no formal motion to amend

 8
had been filed, and Appellants had not offered what "ministerial" acts Respondents had

failed to perform that would make official immunity inapplicable. This appeal follows.

 Standard of Review

 We review the trial court's ruling on the motion for judgment on the pleadings de

novo. Woods v. Mo. Dept. of Corrections, 595 S.W.3d 504, 505 (Mo. banc 2020). "The

party moving for judgment on the pleadings admits, for purposes of the motion, the truth

of all well pleaded facts in the opposing party's pleadings." Anderson v. Crawford, 309

S.W.3d 863, 866 (Mo. App. W.D. 2010).

 Analysis

Waiver of Official Immunity Defense

 In their first point on appeal, Appellants claim that the trial court erred in granting

judgment on the pleadings because official immunity is an affirmative defense, which is

waived if not raised in the responsive pleadings, and, even though Respondents' answer did

expressly raise official immunity as an affirmative defense, Respondents waived the

defense by denying that they were Missouri employees. We disagree.

 Appellants' First Amended Petition alleged, in paragraph 16:

 The following persons were, at all relevant times, employees of MoDSS,
 acting in his or her capacity as an employee of and in the course of his or her
 employment with MoDSS, and at all relevant times, were under the direct
 supervision, employ, and control of MoDSS:
 a. Rebecca Caldwell
 b. Jamie Pinney
 c. Kallie Fewins
 d. Julie King
 e. Mari Wheeler
 f. Michael Beetsma
 g. Megan Bruce

 9
 h. Richard Bird
 i. Brittany Burleson
 j. Madonna Forthofer
 k. Jane Doe, real name unknown.
 l. John Doe, real name unknown.

 In Respondents' Answer to the First Amended Petition, Respondents responded to

the allegations in paragraph 16 as follows: "Defendants deny the allegations contained in

this Paragraph; specifically, Defendants deny that Fewins or King were employed by the

Missouri DSS during the relevant period of time." A logical reading of the petition and the

answer leads to the conclusion that Respondents intended to deny only that Fewins and

King were MoDSS employees for purposes of the petition.2 The answer then expressly

pleads that the Respondents, "as employees of the state of Missouri, are entitled to official

immunity due to the fact that they did not breach any mandatory, non-discretionary duty

imposed by statute or regulation whose breach resulted in harm to the Plaintiffs."

 Moreover, even if the Respondents' answer had denied the individuals were

employees of MoDSS, the denial still would not have prohibited the trial court from

granting the motion for judgment on the pleadings based on official immunity. This is

because "[t]he party moving for judgment on the pleadings admits, for purposes of the

motion, the truth of all well-pleaded facts in the opposing party's pleadings." Anderson,

309 S.W.3d at 866 (emphasis added). Accordingly, even if certain individual Respondents

had intended to deny their employment with MoDSS for some purposes, for purposes of

the motion for judgment on the pleadings, their employment was admitted. They then

 2
 Notably, the Appellants have not made any arguments on appeal concerning defendants Fewins and King
- either to argue that the circuit court's judgment should be reversed specifically as to them, or that the Appellants
should have been permitted to amend the allegations of their petition with respect to Fewins and King.

 10
expressly pled the affirmative defense of official immunity in their answer. They did not

waive this affirmative defense.

 In addition, Appellants did not raise the issue of waiver before the trial court in their

opposition to the motion for judgment on the pleadings. "We will not convict a trial court

of error on an issue that it had no chance to decide." Holmes v. Kan. City Pub. Sch. Dist.,

571 S.W.3d 602, 613 (Mo. App. W.D. 2018).

 Point I is denied.

Merits of Official Immunity Defense

 Appellants' second point on appeal is that the trial court erred in granting judgment

on the pleadings because the First Amended Petition pleaded a viable legal theory of

negligence in that, taking all facts as true and inferences in Appellants' favor, it sufficiently

alleged that Respondents breached a ministerial duty by failing to refer A.J.'s case to the

proper authorities and, assuming that the First Amended Petition was deficient, the trial

court erred by believing it did not have the authority to grant Appellants leave to file a

Second Amended Petition absent a formal motion where Appellants requested (again, in

the alternative) leave to amend their petition in their response to the motion for judgment

on the pleadings. The reading of this point demonstrates its multifarious nature.

Multifarious points on appeal preserve nothing for review. Doe v. Ratigan, 481 S.W.3d

36, 43 (Mo. App. W.D. 2015). However, because we prefer to decide cases on the merits,

we elect ex gratia to address the distinct claims raised in the point.

 "Official immunity. . . protects public officials sued in their individual capacities

'from liability for alleged acts of negligence committed during the course of their official

 11
duties for the performance of discretionary acts.'" State ex rel. Alsup v. Kanatzar, 588

S.W.3d 187, 190 (Mo. banc 2019) (quoting Southers v. City of Farmington, 263 S.W.3d

603, 610 (Mo. banc 2008)). Official immunity protects public officials from liability when

the official acts within the course of his official duties and also acts without malice. Id.

"The purpose of this doctrine is to allow public officials to make judgments affecting the

public safety and welfare without the fear of personal liability." Id. (internal quotation

omitted). "This is because, if an officer is to be put in fear of financial loss at every exercise

of his official functions, the interest of the public will inevitably suffer." Id. (internal

quotation omitted).

 Indeed, "[c]ourts and legal commentators have long agreed that society's
 compelling interest in vigorous and effective administration of public affairs
 requires that the law protect those individuals who, in the face of imperfect
 information and limited resources, must daily exercise their best judgment in
 conducting the public's business." Kanagawa v. State ex rel. Freeman, 685
 S.W.2d 831, 836 (Mo. banc 1985). Therefore, when a public official asserts
 the affirmative defense of official immunity, she should be afforded such
 immunity so long as she was acting within the scope of her authority and
 without malice. Green v. Lebanon R-III Sch. Dist., 13 S.W.3d 278, 284 (Mo.
 banc 2000). ("Under the doctrine of official immunity, a public official is
 not liable to members of the public for negligence that is strictly related to
 the performance of discretionary duties.") (citing Green, 738 S.W.2d at 865).

Id.

 Official immunity, however, only "protects public employees from liability for

alleged acts of negligence committed during the course of their official duties for the

performance of discretionary acts." Laughlin v. Perry, 604 S.W.3d 621, 627 (Mo. banc

2020) (internal quotation omitted). "The official immunity doctrine does not protect public

employees for alleged acts of negligence for the performance of ministerial duties." Id.

 12
The question here, is whether the MoDSS employee Respondents were performing

discretionary acts or ministerial acts in their interactions with A.J. and his family.

 "Whether an act can be characterized as discretionary depends on the degree of

reason and judgment required." Southers, 263 S.W.3d at 610. "A discretionary act requires

the exercise of reason in the adaptation of means to an end and discretion in determining

how or whether an act should be done or course pursued." Id. Whereas Alsup defines a

ministerial act as such:

 Generally, a ministerial act has long been defined as merely clerical. And
 this Court has noted that a ministerial duty compels a task of such a routine
 and mundane nature that it is likely to be delegated to subordinate officials.
 For more than a century, this Court has held that a ministerial or clerical duty
 is one in which a certain act is to be performed upon a given state of facts in
 a prescribed manner in obedience to the mandate of legal authority, and
 without regard to [the public official's] judgment or opinion concerning the
 propriety or impropriety of the act to be performed. Thus, the central
 question is whether there is any room whatsoever for variation in when and
 how a particular task can be done. If so, that task—by definition—is not
 ministerial.

Alsup, 588 S.W.3d at 191 (internal citations and quotations omitted).

 Appellants argue that various statutes and "protocols" required MoDSS employees

to report A.J.'s case "to the proper authorities" once A.J.'s family refused to cooperate, and

this requirement rendered the MoDSS employees' next steps ministerial in nature. But

"[t]he fact that a statute or regulation may confer authority—or even a duty—to act in a

given situation says nothing about whether the act authorized or compelled is the sort of

ministerial or clerical act to which immunity does not extend." Id. at 192. "Thus the

relevant inquiry is not whether the law authorizes, regulates, or requires an action. Instead,

it is whether the action itself is ministerial or clerical." Id. "And[] even when a clerical or

 13
ministerial act appears to be authorized or required by statute, official immunity will still

apply if the official retains authority to decide when and how the act is to be done.” Id.

 Appellants' argument reveals that the actions of the MoDSS employees were

discretionary in nature. Even as they argue that the acts were required and thus ministerial,

the brief argues that "[i]t is reasonable to infer a 'referral to the appropriate authorities'

means each defendant was required to send information about the danger to A.J. to the

juvenile officer or juvenile court in some manner by using one of the hundreds of forms

promulgated by MoDSS, by phone, fax, or email." Even Appellants' own characterization

of the actions Respondents were required to take shows the discretion in how the reporting

was to be done and discretion as to whom they were to report the information. And much

like the Alsup court, which concluded that the determination of the need to restrain a

school-age child and the means and manner to accomplish the restraint were "about as far

from the sort of clerical or ministerial acts. . . as one can imagine," we conclude that the

MoDSS employees' decisions as to what actions to take following hotline calls of abuse,

followed by their own investigations and necessarily weighing the interest and safety of

the child against the goal of keeping the family intact are equally far from the sort of

ministerial or clerical acts contemplated by the "narrow" exception to official immunity.

Id. at 193-94.

 As for the trial court's refusal to grant leave to Appellants to amend their petition a

second time, they are correct that Rule 55.33 allows a party to amend a pleading only by

consent of the adverse party or by leave of the court after a responsive pleading is filed.

And while leave to amend "shall be freely given when justice so requires," the trial court's

 14
decision whether to allow or deny amendment "will not be disturbed absent an obvious and

palpable abuse of discretion." Moore v. Armed Forces Bank, N.A., 534 S.W.3d 323, 328

(Mo. App. W.D. 2017). "Courts consider a number of factors in determining whether to

grant leave to amend a petition, such as the reasons for the moving party's failure to include

the matter" in the original [pleadings]. Id. (internal quotation omitted). "Courts have

found no abuse of discretion in denying leave to amend when the moving party fails to

show the pleadings include any facts that were unknown when the original pleading was

filed." Id. (internal quotation omitted). In this case, the leave to amend sought only to

more persuasively plead that the various laws and protocols providing the general

framework for MoDSS employees in conducting their investigations of allegations of abuse

and the actions taken subsequent to the investigations were somehow ministerial instead of

discretionary, a conclusion we have already rejected. Appellants do not argue that any

previously unknown facts would have been included in a second amended petition. They

further do not set forth any facts that they could allege in an amended pleading that would

remove the actions of the Respondents from the application of the official immunity

doctrine. Accordingly, under these facts, the trial court did not abuse its discretion in

refusing to allow Appellants to amend their petition a second time.

 Point II is denied.

 15
 Conclusion

 For all of the above-stated reasons, we affirm the judgment of the trial court.

 __________________________________
 Gary D. Witt, Judge

Karen King Mitchell concurs.
Pfeiffer, P.J., concurs in separate opinion.

 16
 IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
 JUDY CONWAY, ET AL., )
 )
 Appellants, )
 WD84487
 )
 v. )
 OPINION FILED:
 )
 March 15, 2022
 REBECCA CALDWELL, ET AL., )
 )
 Respondents. )

 Concurring Opinion

 I concur in the opinion authored by my colleague, Judge Witt, in all respects

pursuant to the law; however, I write separately to express my sincere hope that nothing

about this case feels like a “victory” for anyone associated with it.

 Though there are many careers that are stressful, perhaps there are none more

stressful than that of a Social Services investigator. I understand and respect that.

 But, the picture painted in the pleadings below—if, in fact, the allegations of the

petition are true—is not a flattering portrayal for how the Social Services system worked

to protect a little boy named A.J.

 I agree that “[o]fficial immunity. . . protects public officials sued in their individual

capacities ‘from liability for alleged acts of negligence committed during the course of
their official duties for the performance of discretionary acts.’” State ex rel. Alsup v.

Kanatzar, 588 S.W.3d 187, 190 (Mo. banc 2019) (quoting Southers v. City of Farmington,

263 S.W.3d 603, 610 (Mo. banc 2008)). Likewise, I agree that “[t]his is because, if a

[Social Services investigator] is to be put in fear of financial loss at every exercise of [her]

official functions, . . . the interest of the public will inevitably suffer.” Id. (internal

quotation marks omitted).

 Applied here, I agree that the role and function of a Social Services investigator is

fraught with difficult circumstances, and the discretionary work that such investigators

perform is valuable to the public and should, generally, be immunized from criticism that

comes in the form of civil lawsuits; nobody, however, should be immunized from

self-reflection.

 Our state’s system of the partnership between the Division of Social Services, the

Juvenile Office, the prosecutorial authorities, and the courts of this state are designed to

protect the A.J.’s of the world. Our system let A.J. down. Let us never forget A.J.’s story.

Let us all learn from it. Let us all be resolved to never let it happen again.

 To A.J.—May your soul rest in peace.

 /s/Mark D. Pfeiffer
 Mark D. Pfeiffer, Presiding Judge

 2